FILED
U.S. DISTRICT COURT
2006 JUN -5  A 9 52
DISTRICT OF UTAH
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| GARY CLEMENTS and DAVID GERBER, Plaintiffs, vs. RESOURCE CONSULTANTS, INC., Defendant. | **MEMORANDUM OPINION AND ORDER** Case No. 2:04-CV-01008 Judge Dee Benson |

Plaintiffs Gary Clements and David Gerber and Defendant Resource Consultants, Inc. ("RCI") have respectively moved for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56. Having considered the motions, the Court issues the following memorandum opinion and order.

## BACKGROUND

This action involves claims by Mr. Clements and Mr. Gerber against their former employer, RCI, for unpaid overtime compensation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a). On January 23, 2002, RCI contracted with the United States to conduct recruiting for the U.S. Army and the U.S. Army Reserves. The United States paid RCI when one of the following occurred: (1) a recruit with no prior military service enlisted in the U.S. Army or the U.S. Army Reserves, (2) a member of the U.S. Army Reserves transferred to the U.S. Army, (3) a former member of the military enlisted in the U.S. Army or the U.S. Army Reserves, or (4) an applicant shipped to his or her assigned training center. *See* Affidavit of Gerald L. Jenkins, at ¶ 12.

RCI employed Mr. Gerber from September 2002 through June 2003 and Mr. Clements

from September 2002 through August 2003. RCI employed Mr. Gerber and Mr. Clements (collectively "plaintiffs") to recruit potential applicants for the U.S. Army and U.S. Army Reserves. The plaintiffs received between one and two weeks of training when they were hired by RCI and periodic training in their offices throughout the course of their employment. *See* Depo. of Gary Clements, p. 18:15-25; and Depo. of David Gerber, p. 33:13-25 and 48:4-12.

Plaintiffs' duties consisted primarily of telephoning, or cold-calling, individuals to inform them about opportunities to serve in the U.S. Army or the U.S. Army Reserves. Mr. Clements testified that he spent the majority of his time as an RCI employee telephoning high school students in an attempt to cull interest in joining the U.S. Army or U.S. Army Reserves:

> Q. So you apparently got a list from Riverton High School?
> A. Oh, yes. All the high schools give U.S. a list - well, a few don't but most of them do and that's where we - that's where we spend the majority of our time is telemarketing on the phone.
> Q. You would call those people cold?
> A. Yes.

*See* Depo. of Gary Clements, p. 69: 19-24. Mr. Gerber testified that his primary duty as an RCI employee was to cold-call individuals and develop interest in enlisting in the military:

> Q. Why did you choose to do very little face-to-face recruiting?
> A. It wasn't a choice. It wasn't - I didn't make the personal choice and say I'm not going to go out and recruit face-to-face. It was just the way that your day ended up being, the opportunity to go out and do that was not there.
> Q. Why? Why not?
> A. Because I was trying to make appointments on the telephone.

*See* Depo. of David Gerber, p. 52: 13-23. Mr. Clements testified that he spent approximately 67 percent of his time as an RCI employee working in RCI's office. *See* Pl. Mem. in Supp. of Mot. for Summ. Judg., Exh. 2, p. 96:2-9. Mr. Gerber testified that he spent approximately 80 percent of his time as an RCI employee in RCI's office. *See* Pl. Mem. in Supp. of Mot. for Summ. Judg., Exh. 1, p. 147:17-148:2. In addition to telephoning potential recruits, plaintiffs also set up and

stood at information stands at local high schools and contacted prospective recruits at known gathering places, such as fast food restaurants.

If a recruit expressed interest in enlisting in the U.S. Army or U.S. Army Reserves, the plaintiffs set up an initial interview in which the recruits would take pre-screening math and English tests to determine if they met the minimum requirements for enlistment. Half of Mr. Clements' initial interviews with applicants were held at RCI's office. *See* Pl. Mem. in Supp. of Mot. for Summ. Judg., ¶ 19. Virtually all of the pre-screening tests administered by Mr. Gerber were conducted at the RCI office. *See* Pl. Mem. in Supp. of Mot. for Summ. Judg., ¶ 19. If the recruit met the minimum requirements for enlistment, the plaintiffs maintained contact with the recruit and engaged in other "follow-up" activities, such as obtaining background checks, court records, birth certificates, health records, and other documents required for enlistment. *See* Pl. Mem. in Supp. of Mot. for Summ. Judg., ¶ 22.

The plaintiffs had no authority to enlist a recruit. Rather, recruits enlisted at the Military Entrance Processing Station ("MEPS"):

> Q: ...Now they're an applicant. Did you take your - when they said that to you, did you think you had made a sale, so to speak?
> A: Oh, no.
> Q: What did you think - what else did you think had to happen before that sale was completed?
> A: They had to actually join and swear in.
> Q: And that always happened at MEPS?
> A: If it did happen, that's where it would happen.
> Q: Sure. If that happened it always happened at MEPS, is that a fair statement?
> A: Yes.

*See* Depo. Gary Clements, p. 136:22-138:22. The MEPS was a facility owned and operated solely by the United States. *See* Affidavit of Gerald L. Jenkins, at ¶ 12. Only at the MEPS could a recruit sign an Oath of Enlistment in the Armed Forces of the United States. *See* Affidavit of Gerald L. Jenkins, at ¶ 12. Although the plaintiffs could not enlist recruits, they drove some

3

recruits to the MEPS so that they could enlist.

When a recruit arrived at the MEPS, he or she underwent a physical exam. If the recruit passed the physical, he or she interviewed with U.S. Army officials and decided whether to enlist in the U.S. Army or U.S. Army Reserves:

> Q: Did you go with your applicants when they went to MEPS to complete their enlistment and swear in?
> A: Oh, no. We had nothing to do with that. We just took them there, got them there, checked them in and then we left. We had no authority to enlist.
> Q: What is your understanding of what happened at MEPS?
> A: First thing is they'll get physicals. Then upon finishing the physical successfully, they see a guidance counselor. The guidance counselor is the one that sits down with them and reviews their test scores and their physical results, looks at all the available openings in the army that that applicant can do based on all their physical and written test results and then they show them all these different jobs and they say, this one is here, this one is there, this begins here, this begins there. Do you have any questions? And if they don't quite know what it means, they'll show them videos and usually the applicant will join.
> Q: Lots of forms are filled out?
> A: Oh, yeah, they apparently do fill out quite a bit.
> Q: Now you indicated earlier in your testimony, did you not, that you would typically drive your applicants to MEPS and then drive them home?
> A: Yes.
> Q: So did you not wait for them?
> A: No, no. We just went back to work. It could be an all-day affair for them. I mean they got there like around, gosh, what was it, six in the morning I think. Yeah, they got there about six in the morning and they would get out of there between like two and four.

*See* Depo. of Gary W. Clements, p. 136:22-138:22. If the recruit enlisted in either the U.S. Army or U.S. Army Reserves, the plaintiffs maintained contact with the recruit until he or she reported to their assigned training center.

RCI paid the plaintiffs a starting salary of $600.00 per week for their recruiting services. In February 2003, RCI increased Mr. Clements' salary to $605.00 per week and Mr. Gerber's salary to $606.00 per week. Additionally, RCI paid the plaintiffs a commission if they reached established quotas for recruits that enlisted and reported to the assigned training center:

> Q. Anything else that you recognize as part of your compensation?
> A. Well, the bonus thing, I understand the format but the bonus, they did change it. It did change often.
> Q. Help me understand exactly what part of this you're referring to when you speak of the bonus system.
> A. Mission box, looks like number 7, so that would mean quarterly. It looks like if you made your quarterly mission box you would get $3,000 that quarter, up to $4,500 which I imagine is because of quality effort you're putting in. If everyone was successful - station mission box means if enough people were successful in that station to where the station made its mission, then we would also get another $1,000 by the looks of it. And then if the company was successful then everyone again would get the $1,862. You would get the $1,800 and the $1,000 if you were one of the people that helped make the overall mission.
> Q. You used the term mission box. It's abbreviated here Msn Bx.
> A. Uh-huh.
> Q. What did you understand that term to mean?
> A. Whatever we were assigned to get in in that three-month period.
> Q. Would it be fair to say then that mission box means the same thing as quota?
> A. Right. It's a more specific quota.

*See* Pl. Mem. in Supp. of Mot. for Summ. Judg., Exh. 2, p. 57:7-58:13.

The plaintiffs kept track of the hours that they worked each day on time cards they submitted to their supervisor at the end of each week or pay period. The supervisor reviewed the time cards and approved the hours worked. *See* Pl. Mem. in Supp. of Mot. for Summ. Judg., Exh. 2, p. 104:20-106:6. Mr. Clements worked 480 overtime hours and Mr. Gerber worked 569.5 overtime hours. *See* Pl. Mem. in Supp. of Mot. for Summ. Judg., ¶ 32, 34.

Mr. Gerber stopped working for RCI in June 2003 and Mr. Clements stopped working for RCI in August 2003. On October 29, 2004 the plaintiffs filed this action against RCI, claiming they were entitled to overtime pay under the FLSA. The Court heard oral argument on both the plaintiffs' and RCI's motions for summary judgment on April 25, 2006. The Court now issues the following Memorandum Opinion and Order GRANTING plaintiffs' motion for summary judgment and DENYING RCI's motion for summary judgment.

## ANALYSIS

Summary judgment is appropriate when the movant demonstrates there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980). The Court considers the factual record and all reasonable inferences that may be drawn from it in the light most favorable to the party opposing summary judgment. *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005).

Both parties agree that the plaintiffs' employment by RCI is covered by the FLSA. The lone issue disputed by the parties is whether the plaintiffs are exempted from the FLSA by the "outside salesman" exemption. "Exemptions to the FLSA are to be narrowly construed; the employer must show the employees fit plainly and unmistakenly within the exemption's terms." *Reich v. Wyoming*, 993 F.2d 739, 741 (10th Cir. 1993) (citations omitted). The question of how an employee spends his time is a question of fact, while the question whether his activities fall within an exemption is a question of law. *See Id.*

The Secretary of Labor sets the boundaries of the FLSA's exemptions through regulations and interpretations announced in opinion letters. The regulations, promulgated pursuant to an express delegation of legislative authority, are to be given controlling weight unless arbitrary, capricious, or contrary to the statute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Counsel*, 467 U.S. 837, 843-44 (1984). "Agency opinion letters do not have the force and effect of law, are not binding on courts, and are not given Chevron-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). "Even so, these interpretations have the power to persuade, if lacking power to control, as they constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Nielsen v. DeVry, Inc.*,

302 F.Supp.2d 747, 753 (W.D. Mich. 2003) (citations omitted).

The FLSA exempts "any employee employed ... in the capacity of outside salesman." 29 U.S.C. § 213(a)(1). An outside salesman is any employee:

> a. Who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places or business in: (1) Making sales within the meaning of section 3(k) of the Act; or (2) Obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
> b. Whose hours of work of a nature other than that described in paragraph (a)(1) or (2) of this section do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employers: Provided, that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

29 C.F.R. § 541.500 (2003).[1] Courts have considered various factors to determine whether an employee qualifies for the "outside salesman" exemption, including whether a position was advertised as a sales position, whether an employee must solicit new business, and whether an employee received specialized sales training. *See Nielsen v. DeVry, Inc.*, 302 F.Supp.2d 747, 756 (W.D. Mich. 2003) (citations omitted).

In order for the outside salesman exemption to apply, an employee must actually make a sale. A sale "includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k) (1999). The Code of Federal Regulations further describes activities constituting sales, stating:

> (b) Generally speaking, the divisions have interpreted section 3(k) of the act to include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property. Thus sales of automobiles, coffee, shoes, cigars, stocks, bonds, and insurance are construed as sales within the meaning of 3(k).

---

[1] The FLSA regulations were amended on August 20, 2004. All references to 29 C.F.R. § 541.500 refer to the provisions of that section that were in effect at the time the plaintiffs were employed by RCI, which was prior to the effective date of the amendments.

> (c) It will be noted that the exempt work includes not only the sales of commodities, but also "obtaining orders for contracts for services or for the use of facilities for which a consideration will be paid by the client or customer." "Obtaining orders or ... for the use of facilities" includes the selling of time on the radio, the solicitation of advertising for newspapers and other periodicals and the solicitation of freight for railroads and other transportation agencies.
> (d) The word "services" extends the exemption as outside salesmen to employees who sell or take orders for a service, which is performed for the customer by someone other than the person taking the order. For example, it includes the salesman of a typewriter repair service who does not himself do the repairing. It also includes otherwise exempt outside salesmen who obtain orders for the laundering of the customer's own linens as well as those who obtain orders for the rental of the laundry's linens.
> (e) The inclusion of the word "services" is not intended to exempt persons who, in a very loose sense, are sometimes described as selling "services". For example, it does not include persons such as servicemen even though they may sell the service which they themselves perform. Selling the service in such cases would be incidental to the servicing rather than the reverse. Nor does it include outside buyers, who in a very loose sense are sometimes described as selling their employer's "service" to a person from whom they obtain their goods. It is obvious that the relationship here is the reverse of that of salesman-customer.

29 C.F.R. § 541.501 (2003).

Although the regulation includes as sales soliciting orders for services, two Department of Labor opinion letters have addressed whether college admissions counselors performed sales or obtained contracts for services such that a sale has occurred for purposes of the statute. The letters each state:

> Ordinarily, an individual who regularly performs recruitment for a college is not engaged in making sales of the college's services, or obtaining contracts for its services. Rather, college recruitment activity appears analogous to sales promotion work, since, like a promotion person who solicits customers for a business, the college recruiter is engaged in identifying their application to the college, which in turn decides whether to make a contractual offer of its educational services to the applicant.

Opinion Letter, Wage and Hour Division, U.S. Dept. of Labor, 1998 WL 852683 (1998); Opinion Letter, Wage and Hour Division, U.S. Dept. of Labor, 1999 WL 1002391 (1999).

In order for the FLSA outside salesman exemption to apply, RCI must demonstrate that

8

the plaintiffs fit clearly and unmistakably within the scope of the exemption. RCI faces an uphill battle in this regard because the statute, regulations and opinion letters are either silent on the subject or tend to support the plaintiffs' position. Section 203(k) of the FLSA, which defines a sale as a "sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition," does not clearly categorize plaintiffs' recruiting endeavors as a sale. Moreover, Section 541.501 of the Code of Federal Regulations does not clearly and unmistakably establish that the plaintiffs' recruiting activities constituted sales. RCI argues that the plaintiffs were engaged in "obtaining orders for contracts for services." The Code of Federal Regulations, however, does not address whether a recruiter who does not consummate a sale of services is engaged in a sale for purposes of the statute.

The plaintiffs argue that the Department of Labor has addressed this issue in their opinion letters, which state that college recruiters are not engaged in obtaining orders or contracts for services because the college admissions committee, not the recruiter, ultimately decides whether to admit the applicant. Thus, recruiters do not consummate any sales under the statute. RCI counters that the plaintiffs' activities are distinguishable from the duties of college recruiters based on a recent case in which the United States District Court in Michigan determined that field representatives for DeVry College conducted sales under Section 203(k) and therefore could qualify for the "outside salesman" exemption. *See Nielsen v. DeVry, Inc.*, 302 F.Supp.2d 747, 753 (W.D. Mich. 2003). The *Nielsen* court distinguished between the DeVry employees and the college recruiters described in the Department of Labor's opinion letters on two grounds. First, the *Nielsen* court found "the opinion letters assumed that the college recruiters under consideration were not involved in deciding 'whether to make a contractual offer' of the colleges' services to the applicant." *Id.*, at 756. Unlike college recruiters who have no authority

9

to admit students.

DeVry used strictly objective admissions criteria, requiring only a high school diploma or GED and certain test scores. While DeVry did not have an "open" admissions policy (i.e., anyone can attend), anyone meeting the objective requirements was automatically admitted. The circumstances in the present case, therefore, do not reflect the dichotomy discussed in the opinion letters between recruiters who solicit applications and admissions personnel who make admissions decisions.

*Id.* RCI argues that by administering pre-screening math and English tests and driving recruits to MEPS where they could enlist, the plaintiffs were obtaining orders or contracts for services, which constitute sales under the statute.

The case on which RCI relies is not binding on this Court and would be distinguishable on two bases even if it was. First, the plaintiffs in the present case did not function like the DeVry recruiters. The DeVry recruiters effectively controlled enrollment because anyone who met the objective requirements was admitted. By contrast, the plaintiffs' recruits were not automatically enlisted in the U.S. Army or U.S. Army Reserves. The plaintiffs had no control over enlistment. Mr. Clements testified that he drove applicants to MEPS and dropped them off at six in the morning. The application process stretched from six in the morning until some time between two and four in the afternoon. During the application process, applicants first underwent a physical. If they passed the physical, they met with a guidance counselor to select a position based on the U.S. Army's or U.S. Army Reserves' needs and the applicant's capabilities. The applicants discussed career options with the guidance counselor and then decided whether or not to enlist. Unlike admission to DeVry in *Nielsen,* this process is not a rubber-stamp; rather, it constitutes a thorough evaluation on the part of MEPS. Because MEPS controlled the enlistment process and the plaintiffs did not participate in the enlistment procedures, the plaintiffs were not engaged in "sales," as required by the FLSA's "outside

10

salesman" exemption. Thus, the plaintiffs do not fit plainly and unmistakably within the outside salesman exemption, as is required by *Reich* for an exemption to the FLSA to apply.

Second, the *Nielsen* court found "in the opinion letters, the task of the college admissions counselors and enrollment advisors ended when a prospective student sent in an application;" by contrast, "[D]eVry field representatives in the present case continued their efforts until prospective students paid tuition and began attending classes." *Id.*, at 755. This distinction does not address whether the employee is making a sale under the statute. Contrary to the position of the *Nielsen* court, continued recruiting would likely indicate no sale was consummated, otherwise further recruitment would not be necessary. Whether the employee continued recruiting after enlistment simply does not determine whether or not the employee has made a sale.

Even if a "sale" pursuant to Section 203(k) did occur, the factors courts have considered indicative of an outside salesman do not plainly and unmistakably cast the plaintiffs as outside salesmen. The plaintiffs were hired as recruiters, not salesmen. They received one to two weeks of training as recruiters followed by periodic training at their offices. The plaintiffs were required to solicit new business; however, they were paid by salary with minimal bonuses for recruits that enlisted and later reported to basic training. These factors fail to plainly and unmistakably categorize the plaintiffs as outside salesmen.

RCI has also failed to demonstrate plainly and unmistakably that the plaintiffs' hours of nonexempt work do not exceed 20 percent of the hours worked as required by Section (b) of 29 C.F.R. § 541.500. Mr. Clements testified that approximately 67 percent his time working for RCI was spent in RCI's office. Mr. Gerber testified that approximately 80 percent his time working for RCI was spent in the RCI office. RCI argues that the plaintiffs spent most of their

office time making telephone calls to recruits and that these telephone calls were performed incidental to and in conjunction with the employees' own outside sales or solicitations, and therefore are not considered exempt under Section (b). This argument fails for two reasons. First, the plaintiffs have testified that their telephone calls typically constituted the initial contact with the prospective recruit. The plaintiffs followed up with those prospective recruits that expressed interest over the phone. Because the plaintiffs' telephone calls generally functioned as a gateway activity, they cannot constitute an activity that is "performed incidental to and in conjunction with the employee's own outside sales."

Second, no evidence shows plainly and unmistakably that the plaintiffs spent less than 20 percent of their office time on nonexempt work. Even if the plaintiffs' telephone activities were exempt under subsection (b), RCI has put forth no evidence that plaintiffs spent enough of their time in the office to reach the 20 percent threshold. The large volume of time plaintiffs spent in the RCI office makes it difficult to assume that all of this time pertained to exempt, outside work. Absent some plain and unmistakable showing that the plaintiffs were not engaged in nonexempt work for more than 20 percent of their time, RCI cannot meet the requirement under subsection (b). Because RCI has failed to demonstrate plainly and unmistakably that the plaintiffs are exempt from the FLSA under the "outside salesman" exemption, the plaintiffs are entitled to summary judgment as a matter of law.

Because plaintiffs are entitled to summary judgment, they are also entitled to reasonable attorney's fees and costs as a matter of law. Section 16(b) of the FLSA provides: "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and the costs of the action." 29 U.S.C. § 216(b). Courts have held that the award of attorney's fees and costs to a prevailing plaintiff in an

FLSA action is mandatory. *See McKenzie v. City of Ottawa, Kansas*, 1989 WL 45392 (D. Kan. 1989). Based on 29 U.S.C. § 216(b), the Court awards plaintiffs a reasonable attorney's fee and costs.

## CONCLUSION

For the reasons stated above, the Court GRANTS the plaintiffs' motion for summary judgment and DENIES RCI's motion for summary judgment. The Court also awards plaintiffs' a reasonable attorney's fee and costs. The Court leaves the question of liquidated damages open for hearing and will entertain submissions of additional evidence pertaining to this matter within the next 30 days.

IT IS SO ORDERED.

DATED this 2nd day of June 2006.

_____
Dee Benson
United States District Judge